UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

UNITED STATES OF AMERICA, ex rel.,
ROBERT SCHWARTZ, Jr.

    Plaintiffs/Relator,

vs.

HCA HOLDINGS, INC., a Delaware corporation,

    Defendant.
_____/

CASE NO;_____

TO BE FILED UNDER SEAL

## SEALED COMPLAINT

The United States of America, by and through *qui tam* relator, Robert Schwartz, Jr. ("Relator," "Relator, Schwartz" or "Schwartz"), brings this action under the False Claims Act, 31 U.S.C. §§ 3729-3732, to recover all damages, penalties and other remedies established by the False Claims Act on behalf of the United States of America.

1. This is an action to recover damages and civil penalties on behalf of the United States of America for violations of the False Claims Act arising from false or fraudulent records, statements, or claims, or any combination thereof, made, used or caused to be made, used or presented by the Defendant, its agents, employees or co-conspirators, or any combination thereof, to the United States Department of Health and Human Services under the Federal Medicare and Medicaid Program.

## Jurisdiction and Venue

2.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1345 (United States as Plaintiff), and 31 U.S.C. §3732(a) (False Claims Act).

3.  Venue is proper pursuant to 31 U.S.C. §3732 (a) because the defendant transacts business within the district and the acts proscribed by the False Claims Act occurred within the district.

4.  Relator did not derive the allegations of wrongdoing specified below from public disclosures. Instead, Relator Schwartz is the "original source" of the information as defined in 31 U.S.C. § 3730(e)(4) on which the allegations contained herein are based.

5.  Schwartz served a copy of this Complaint upon the United States Government, together with a written disclosure statement setting forth and enclosing all material evidence and information he possesses pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

6.  Relator Schwartz has complied with all other conditions precedent to bringing this action.

## The Parties

7.  Relator Schwartz, Jr. is a citizen of the United States and presently resides in Syracuse, New York. At all times material to the issues raised in this Complaint, Schwartz was a resident of Port St. Lucie, Florida.

8.  Defendant, HCA Holdings, Inc. ("HCA") is a Delaware corporation with its principal place of business in Nashville, Tennessee.

## Factual Allegations

9. HCA is the owner and operator of healthcare facilities throughout the United States, including the following facilities at issue: JFK Medical Center located in Atlantis, Florida; Port St, Lucie Hospital and Treasure Coast Behavioral Healthcare at Lawnwood, located in Port St. Lucie, Florida; and West Palm Hospital, located in West Palm Beach, Florida.

10. At all times material to this Complaint, from approximately 2001 to 2013, Schwartz was employed by HCA as the Daytime Charge Nurse for the Emergency Department at JFK Medical Center.

11. In 1986, the United States Congress enacted the Emergency Medical Treatment & Labor Act (hereinafter referred to as "EMTALA"). The purpose of EMTALA was to ensure that Medicare eligible hospitals offering emergency department services did not turn away anyone based on ability to pay. Therefore, EMTALA mandates that a medical screening examination ("MSE") be provided to any person who presents at the emergency room and makes a request or a request is made on the person's behalf for examination or treatment of a *medical* condition to determine whether an emergency *medical* condition ("EMC") exists. *Title 42 U.S.C. §1395dd.*

12. The act goes on to define an EMC as a *medical* condition "manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in..." serious jeopardy to health, impairment of bodily functions or dysfunction of a bodily organ. *Id. at §1395dd(e).*

13. An MSE is defined in interpretative guidance by the federal government as:

> An MSE is the process required to reach, with reasonable clinical confidence, the point at which it can be determined whether the individual has an EMC or not. An MSE is not an isolated event. It is an ongoing process that begins, but typically does not end, with triage.

> Triage entails the clinical assessment of the individual's presenting signs and symptoms at the time of arrival at the hospital, in order to prioritize when the individual will be seen by a physician or other qualified medical personnel (QMP).
>
> Individuals coming to the emergency department must be provided an MSE appropriate to the individuals' presenting signs and symptoms, as well as the capability and capacity of the hospital. Depending on the individual's presenting signs and symptoms, an appropriate MSE can involve a wide spectrum of actions, ranging from a simple process involving only a brief history and physical examination to a complex process that also involves performing ancillary studies and procedures, such as (but not limited to) lumbar punctures, clinical laboratory tests, CT scans, and/or other diagnostic tests and procedures. The medical record must reflect continued monitoring according to the individual's needs until it is determined whether or not the individual has an EMC and, if he/she does, until he/she is stabilized or appropriately transferred. There should be evidence of this ongoing monitoring prior to discharge or transfer.
>
> The MSE must be the same MSE that the hospital would perform on any individual coming to the hospital's dedicated emergency department with those signs and symptoms, regardless of the individual's ability to pay for medical care. If a hospital applies in a nondiscriminatory manner (i.e., a different level of care must not exist based on payment status, race, national origin, etc.) a screening process that is reasonably calculated to determine whether an EMC exists, it has met its obligations under EMTALA. If the MSE is appropriate and does not reveal an EMC, the hospital has no further obligation under 42 CFR 489.24.

See, CMS *Manual System, Publication 100-07 State Operations Provider Certification, July 16, 2010, Interpretavitve Guidelines §489.24(a)(1)(I)*.

14.     The Florida Mental Health Act, also known as "The Baker Act," codified in Chapter 394, Part 1, Florida statutes provides legal procedures for mental health examination and treatment. The Baker Act permits law enforcement officers, the circuit courts and certain qualifying mental health professionals and physicians to initiate an involuntary exam of an individual who appears to have a mental illness or presents a danger to themselves or others and refuses to consent to an exam or is unable to understand the need for an exam. Fla. Stat. §394.463 (1971).

4

15. An involuntary exam is a *psychiatric* exam conducted without a person's consent and is often referred as "getting Baker Acted". Involuntary exams are provided only by receiving facilities designated by the Florida Department of Children and Families ("DCF").

16. JFK Medical Center, Port St, Lucie Hospital, Treasure Coast Behavioral Healthcare at Lawnwood, and West Palm Hospital are DCF-designated receiving facilities for Baker Acted individuals.

17. The involuntary exams contemplated by the Baker Act are *psychiatric* examinations that should occur in the Behavioral Health Units of the facilities, not *physical* examinations in the Emergency Department unless the individual is suffering from an emergency medical condition as defined by §395.002, Florida Statute.[1]

18. At JFK Medical Center, HCA created policies and procedures which resulted in all Baker Acted individuals being initially processed and treated in the emergency room where the patients were forced to undergo unnecessary physical examinations and testing not authorized under the Baker Act. Only after an emergency room visit, which included lab work and various tests, did the patient meet with a psychiatric nurse, whether in the Behavioral Health Unit, or elsewhere.[2]

19. JFK Medical Center mandated that emergency medical services ("EMS") and law enforcement officers transport all Baker Acted patients directly to the Emergency Room as opposed to the Behavioral Health Unit.

---

[1] Florida Statute, § 395.002 defines an "emergency medical condition" as "[a] medical condition manifesting itself by acute symptoms of sufficient severity, which may include severe pain, such that the absence of immediate medical attention could reasonably be expected to result in any of the following:1) Serious jeopardy to patient health, including a pregnant woman or fetus; 2) Serious impairment to bodily functions; 3) Serious dysfunction of any bodily organ or part."

[2] Upon information and belief, the same impermissible practices alleged herein are followed at other HCA hospitals.

5

20. Contrary to JFK Medical Center's mandate alleged in paragraph 19 above, the State of Florida requires that:

> "Other than when an emergency medical condition exist, the person must be delivered to **the nearest designated receiving facility – not to an emergency room** that might be more convenient to the law enforcement officer, unless a Transportation Exception Plan has been approved by the Board of County Commissioners and DCF. If the person requires transfer to a different facility for specialized care, the sending facility is responsible for arranging safe and appropriate transportation."

*Baker Act Handbook and User Reference Guide / 2004:* **The State of Florida Department of Children's and Families, Transportation of Persons for Involuntary Examination; citing Florida Statute §394.462 and Florida Admin. Code 65E-5.260.**

21. While working in the Emergency Department at JFK Medical Center, Schwartz observed virtually every Baker Acted patient initially processed through the Emergency Department and forced to undergo *physical* exams and treatment not authorized by the Baker Act. Schwartz voiced concerns to his supervisors regarding the practice of having Baker Acted patients processed in the emergency room, as a matter of course, as opposed to the hospital's Behavioral Health Services Unit where the patient would undergo the *psychiatric* exam prescribed by Florida Statute.

22. JFK Medical Center failed to review the policy and continued processing all Baker Acted patients through the emergency room and billing the patients for emergency room visits and related treatment. If the patients did not consent to the lab work, HCA restrained the patients and forced them to undergo the treatment.

23. As a result, HCA charged these patients for involuntary tests in the emergency room that were unnecessary and unauthorized.

24. The Medicare and Medicaid Program is a system of health insurance administered by the United States Department of Health and Human Services through the Center for Medicare

6

and Medicaid Services ("CMS"). Medicare provides health insurance programs for persons 65 years of age or older. Specifically, Medicare Part A provides coverage for inpatient hospital care while Medicare Part B provides coverage for emergency room services billed directly by the hospital. Medicaid provides health insurance programs for low income individuals and families, and the disabled. The Programs are 100% federally subsidized.

25. Upon information and belief, a substantial portion of patient billing generated by JFK Medical Center, an HCA facility, is for Medicare and Medicaid patients.

26. Upon information and belief, a substantial portion of patient billing generated by Port St. Lucie Hospital, a HCA facility, is for Medicare and Medicaid patients.

27. Due to HCA's practice of processing all Baker Acted patients through the Emergency Department and forcing the patients to undergo certain unnecessary tests, HCA charged the patients for unnecessary and unauthorized tests. Thus, HCA maintained a practice of improperly billing Medicare and Medicaid for emergency room services for Baker Acted patients.

28. HCA engaged in this fraudulent practice and made false claims to Medicare and Medicaid to increase the amount of reimbursement to the HCA facility. Medicare and Medicaid claims are false if claimed for services or costs that were unnecessary or not rendered as claimed.

29. Upon information and belief, this practice that Schwartz witnessed at JFK Medical Center was also employed at other HCA hospitals, including, but not limited to, Port St. Lucie Hospital and Fort Walton Beach Medical Center.

30. Indeed, in Okaloosa County, Florida, the City of Crestview Police Department is directed to take Baker Acted patients to one of two facilities—Bridgeway Center of Fort Walton Beach (a non-HCA facility) or Fort Walton Beach Medical Center (an HCA facility). According

to Bridgway's policies, a law enforcement official shall leave the patient at the receiving facility with the primary supervisor on duty or an *Inpatient* nurse. In contrast, Fort Walton Beach Medical Center's policies instruct the law enforcement official to leave the patient at the Emergency Department. The policy further states that the "Emergency Department staff will expedite placement of Baker Act patients."

31.     Similarly, Orange Park Medical Center, an HCA facility in Clay County entered into a Memorandum of Understanding ("MOU") with the local police departments regarding the transportation of Baker Acted patients. The MOU mandates that the officers or deputies deliver all Baker Acted patients to the "emergency department for admission."

32.     While Schwartz is able to identify examples of the false claims in this Complaint, Relator is unable to plead all of the details or all of the occasions in which HCA committed fraud because the necessary information is in the custody and control of HCA.

### The case of S.G. at West Palm Hospital

33.     As an example of the scheme devised by HCA, Schwartz recently became aware of the treatment of S.G., a 29-year-old female.  On September 25, 2013, S.G. attended a short therapy session with a social worker at the Alpert Jewish Family and Children Services located at 5841 Corporate Way, West Palm Beach, Florida to discuss her anxiety.  After the session, the social worker referred S.G. to the emergency room at West Palm Hospital, a facility owned and operated by HCA, to inquire about the inpatient and outpatient mental health programs. The Pavilion at West Palm Hospital is the behavioral health unit designed to conduct the involuntary psychiatric examinations of patients transported to the facility under the Baker Act.

34.     At or around 7:00 pm that evening, S.G. went to the emergency room at West Palm Hospital to inquire about the inpatient and outpatient mental health programs.  Instead of

referring S.G. to The Pavilion, she was immediately triaged by the emergency room nurse, who, without S.G.'s consent, took her vitals. S.G. was then examined by the emergency room's physician's assistant and advised that the emergency room physician, Dr. Nicole Pomerantz, who had never seen nor spoken to S.G., had decided to admit S.G. to the psychiatric ward without her consent under the Baker Act. S.G. was then strip searched, forced into a hospital gown and at 8:47 p.m., compelled to undergo an urinalysis and drug screening. All results were negative and normal.

35.  S.G. was then instructed to take an anti-anxiety prescription medication and was told that if she did not comply with the tests and take the medication, hospital employees would restrain her and force the treatment. At that time no mental healthcare provider had evaluated or examined S.G.

36.  S.G. refused all blood tests, and no blood was drawn from her.

37.  At approximately 10:05 p.m., S.G. was admitted to The Pavilion, placed in a shared room with another mental health patient and left there overnight.

38.  Nearly 24 hours later, S.G. was evaluated, for the first time, by a mental healthcare provider, Dr. Joseph Philippe Martineau. After a ten minute examination, Dr. Martineau concluded that S.G. was not psychotic or depressed and immediately discharged her.

39.  At the time of the incident, S.G. was insured by a commercial insurance company. The Explanation of Benefits ("EOB") received by S.G. indicated that West Palm Hospital charged S.G. and her carrier for an emergency room visit, urinalysis, multiple drug screening tests and blood work, even though no blood was ever drawn from S.G.

40.  This incident, which was a nightmare for S.G. as she was merely seeking information as suggested by her therapist and instead found herself admitted to a psychiatric

ward for no reason, was consistent with HCA's practices and policies to fraudulently increase revenue witnessed by Schwartz at JFK Medical Center.

### The case of D.G. at Port St. Lucie Hospital

41.  On November 3, 2011, D.G. had an argument with his wife, and a bystander called 911. A Port St. Lucie Police officer arrived at D.G.'s home, arrested him and transported him to the emergency room at Port St. Lucie Hospital for an involuntary examination under the Baker Act. D.G was transported to the emergency room, as opposed to HCA's Behavioral Healthcare unit because HCA had implemented a directive mandating that all officers process patients restrained under the Baker Act through the emergency department.

42.  At 12:05 p.m. D.G. arrived at the emergency room at Port St. Lucie Hospital. At 12:20 p.m., D.G. was triaged in the emergency room and determined to have no drug, alcohol or prescription drug usage. His vital signs were normal. D.G. presented "calm", "logical", "pleasant", "cooperative" and "well spoken". At that time, his speech was clear, his mood was appropriate and he had a steady gate.

43.  Dr. Maria Martone, the emergency room physician, examined D.G. and documented that he had no prior psychiatric history, he was not in distress, had a normal physical examination and that his behavior was normal. Nonetheless, at 12:35 p.m., Dr. Martone, in accordance with HCA policy, ordered blood work, urinalysis, drug screening tests, a blood alcohol test, a tetanus shot and prescribed acetaminophen and aspirin.

44.  Notwithstanding Dr. Martone's findings, recited above, at 1:56 p.m., D.Gwas forced to undergo blood work, tests and compelled to take prescription drugs against his will. He was then strip searched, and all his belongings, including his wedding ring, were taken from him. No mental healthcare provider examined or evaluated D.G. until 4:30 p.m. and he was admitted

to the psychiatric unit at 6:18 p.m. with a diagnosis of "major depression". In the hours that followed, D.G was subjected to additional prescription medication and blood work.

45. The following day, on November 4, 2011, D.G. was examined by Dr. Marie-Addly Cambronne who recommended discharge "due to lack of criteria for inpatient hospitalization." Dr. Addly Cambronne determined that D.G. was "psychiatrically stable" and discharged D.G at approximately 5:30 p.m.

46. At the time of this incident, D.G was employed by the United States Postal Service and was provided healthcare coverage through Blue Cross as part of the Federal Employee Plan. D.G. and his insurance carrier were billed over $10,000 for the unnecessary and unauthorized treatment described above.

47. This incident, and the manner in which D.G was treated, was consistent with HCA's practices and policies to increase revenue witnessed by Schwartz at JFK Medical Center.

## False Claims Act Violations

48. HCA encouraged, authorized and ratified all the violations of the False Claims Act committed by its various officers, agents and employees.

49. In submitting false Medicaid and Medicare claims to the Government, HCA falsely certified, expressly and implicitly, compliance with all Medicaid and Medicare rules and regulations.

50. By engaging in the acts set forth above, related to patients who were Medicare or Medicaid beneficiaries, HCA, by and through its agents, officers and employees, in violation of the False Claims Act, 31 U.S.C. §§3729-3733, knowingly presented or caused to be presented to the Government, numerous false or fraudulent claims for payment or approval.

51. The United States, patients of HCA owned hospitals, private insurance companies and the public have all been damaged as a result of HCA's violations of the False Claims Act.

52. The United States is entitled to treble damages based upon the amount of damage sustained by the United States as a result of HCA's violation of 31 U.S.C. §3729.

53. In addition, the United States is entitled to a civil penalty of between $5,000 and $10,000 as required by 31 U.S.C. §3729 for each violation of the False Claims Act by HCA.

54. Schwartz is also entitled to reasonable attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d)(1).

WHEREFORE, the Relator, Robert Schwartz, Jr., on behalf of himself, the United States and the State of Florida requests that this Court grant the following relief:

a. That Defendant be ordered to cease and desist from violating 31 U.S.C. §3729;

b. That judgment be entered against the Defendant, HCA Holdings, Inc., in an amount equal to three times the amount of damages the United States has sustained because of its actions, plus (i) a civil penalty of $5,000 to $10,000 for each violation of 31 U.S.C. §3729, and (ii) the costs of this action, including the costs of the United States for its expenses related to this action;

c. That the Relator be awarded all costs including reasonable attorneys' fees;

d. That in the event the United States intervenes in this action, the Relator be awarded 25%, but in no event less than 15% of the proceeds of the resulting judgment or settlement of this action;

    e. That in the event the United States does not intervene in this action, the Relator be awarded 30%, but in no event less than 25%, of the proceeds of the resulting judgment or settlement of this action;

    f. That the Relator and the United States be awarded prejudgment interest; and

    g. That the United States and the Relator receive all relief both at law and in equity as this Court defines as appropriate.

### Demand for Jury Trial

Plaintiffs hereby demand a jury trial on all issues so triable.

Dated on January 22nd, 2014.

    GENOVESE JOBLOVE & BATTISTA, P.A.
    4400 Miami Tower
    100 Southeast Second Street
    Miami, Florida 33131
    Telephone: (305) 349-2300
    Facsimile: (305) 349-2310
    Attorneys for Plaintiff Robert Schwartz, Jr.

    _____
    Michael D. Joblove
    Florida Bar No.: 354147
    mjoblove@gjb-law.com
    Theresa VanVliet
    Florida Bar No.: 374040
    tvanvliet@gjb-law.com

    ALAN GOLDFARB, P.A.
    100 Southeast Second Street
    45th Floor
    Miami, Florida 33131
    Telephone: (305) 371-3111
    Facsimile: (305) 577-8375
    Attorneys for Plaintiff Robert Schwartz, Jr.

    _____
    Liah Catanese
    Florida Bar No.: 48017
    lcatanese@goldfarbpa.com

Alan Goldfarb
Florida Bar No.: 146924
agoldfarb@goldfarbpa.com


Janice V. Fisher, Esq.
900 Delaware Avenue
Fort Pierce, Florida 34950
Telephone: (772) 595-9899
Facsimile: (772) 595-8119
Attorneys for Plaintiff Robert Schwartz, Jr.

_____
Janice V. Fisher
Florida Bar No.: 450480